IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

DAWN M. WRIGHT,

    *Plaintiff,*

    v.

KENT COUNTY DEPARTMENT OF
SOCIAL SERVICES, et al.,

    *Defendants.*

Civil Action No. ELH-12-3593

## MEMORANDUM OPINION

Plaintiff Dawn Wright filed suit against her employer, the Kent County Department of Social Services ("DSS"), as well as two individuals, Kerry Ahern-Brown, Director of DSS, and Stephen Sturgill, Assistant Director of DSS (collectively, the "individual defendants"),[1] alleging employment discrimination.[2]  In particular, the Amended Complaint (ECF 8) contains seven counts: (1) employment discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, as amended ("Title VII") (against DSS); (2) racial discrimination in contract, in violation of 42 U.S.C. § 1981 (against all defendants); (3) retaliation under Title VII (against DSS); (4) retaliation under the Family and Medical Leave Act, 29 U.S.C. §§ 2601 *et seq.* (against the individual defendants); (5) violation of various federal constitutional and statutory rights, under 42 U.S.C. § 1983 (against the individual defendants); (6) violation of

---

[1] Although at least one document indicates that Kerry Ahern-Brown's name is spelled "Ahearn-Brown," *see* ECF 14-4 (memorandum dated December 11, 2008), I will adopt the spelling used by the parties.

[2] Initially, plaintiff filed a twelve-count Complaint only against DSS.  *See* ECF 1.  After DSS filed a "Motion to Dismiss or in the Alternative Motion for Summary Judgment," ECF 5, plaintiff filed a seven-count Amended Complaint.  ECF 8.  Among other changes, she added Sturgill and Ahern-Brown as defendants.  *See id.*

various federal constitutional and statutory rights, under 42 U.S.C. § 1983 (against DSS); and (7) conspiracy to deprive plaintiff of federal rights under 42 U.S.C. § 1985(3) (against the individual defendants). Wright demands $300,000 in compensatory damages from the defendants, with interest, costs, and legal fees. Amended Complaint ("Am. Compl.") ¶¶ 50, 83. As to Sturgill and Ahern-Brown, plaintiff also demands $1,000,000 in punitive damages. *Id.* ¶ 83.

Defendants have filed a pre-discovery motion to dismiss or, in the alternative, motion for summary judgment (ECF 14, the "Motion"), which plaintiff opposes (ECF 17). The Motion has been fully briefed,[3] and no hearing is necessary to resolve it. *See* Local Rule 105.6. For the reasons that follow, I will grant the Motion in part and deny it in part.

## Background

### A. Factual Background[4]

Wright, an African-American female, has been employed by DSS since 1993 and currently holds the position of Supervisor – Work Opportunities. Am. Compl. ¶¶ 3, 7. On or about May 14, 2008, Wright received her mid-cycle evaluation, in which she received an overall rating of "Exceeds Standards." *Id.* ¶ 8. Sturgill completed the May 2008 evaluation, which was approved by Ahern-Brown. *Id.* On or about November 25, 2008, Wright received her end-cycle evaluation, also completed by Sturgill, and again received an overall rating of "Exceeds Standards." *Id.* ¶ 10. However, Ahern-Brown "refused to sign/approve Wright's November

---

[3] In particular, I have reviewed defendants' Motion to Dismiss or in the Alternative Motion for Summary Judgment (ECF 14, "Def. Mot.") as well as the accompanying memorandum (ECF 14-1, "Def. Mem."), and plaintiff's Memorandum in Opposition to Defendants' Motion to Dismiss or in the Alternative Motion for Summary Judgment (ECF 17, "Opp."). Defendants did not reply.

[4] The facts are drawn largely from plaintiff's Amended Complaint. As discussed, *infra*, I have assumed the truth of the allegations for the purpose of the Motion.

2008 evaluation because she did not agree with it." *Id.* ¶ 11. Although "Wright was never told why Ahern-Brown refused to sign it," the evaluation was forwarded to DSS's Department of Human Resources. *Id.*

From approximately December 5, 2008, until February 17, 2009, Wright took a medical leave of absence from DSS due to a work-related injury. *Id.* ¶ 12. The parties disagree as to whether Wright was on leave pursuant to the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601 *et seq.*, during that time. *Compare* Opp. at 16-17 (stating that Wright was on workers' compensation leave between December 2008 and February 2009 and only took FMLA leave in November 2009) *with* Def. Mem. at 24 (stating that Wright was on FMLA leave between December 2008 and February 2009). According to Wright, upon returning to work in February 2009, her superiors did not meet with her to familiarize her with events that had occurred during her leave of absence, nor was she informed of any changes to the DSS hierarchy or to the DSS Standard Operating Procedures ("SOPs"). Am. Compl. ¶ 13.

The Amended Complaint further asserts that, upon returning, Wright observed "changes in the behavior and attitude of several white subordinates," including Kara Morris, Beth Collins, and Gene Powers. *Id.* According to Wright, those three employees all reported to African-American supervisors: either Wright or Sandra Crawford. In particular, Wright alleges that "there appeared to be a communication breakdown with openly offensive, hostile, and threatening behavior by the white subordinates against their African-American supervisors," which included, among other things: (a) Morris and Collins reporting not to Wright and Crawford, but instead reporting directly to Sturgill, the Caucasian supervisor of Wright and Crawford; (b) Morris and Collins assuming "a more authoritative and supervisory role within the

division"; and (c) statements made to Wright by Morris and Collins that were "humiliating, embarrassing, and demeaning," indicating that "they were taking over Wright's and Crawford's supervisory positions." *Id.* ¶ 15.

On or about March 5, 2009, Wright sent an email to Sturgill in an attempt to address her concerns about Morris, Collins, and Powers, but Sturgill did not respond. *Id.* ¶ 16. Nevertheless, Wright says that on March 16, 2009, she received an email from Sturgill indicating that he had designated Powers as the "unit triage person." *Id.* ¶ 16. In light of her March 5 email, Wright asserts, the decision to grant additional responsibilities to Powers subjected her "to additional humiliating, embarrassing, demeaning, and discriminatory treatment in front of other employees whom Wright supervised and/or worked with at the DSS." *Id.* ¶ 17. Powers, however, allegedly refused to perform the duties as the unit triage person as outlined in the SOPs and, when confronted by Wright, denied that the tasks were his responsibility. *Id.* ¶ 18. Further, Powers allegedly went to a Caucasian supervisor, Lisa Falls, who assigned those tasks to another employee. *Id.* Wright claims that when she reported these events regarding Powers to Sturgill on or about March 19, 2009, he declined to address the matter with either Powers or Wright. *Id.* ¶ 19. Sturgill's actions, Wright says, amounted to tacit approval of Powers's discriminatory attitude toward Wright. *Id.* ¶ 20.

According to Wright, on or about March 20, 2009, Powers entered Wright's office, was "openly hostile," and "made threatening move towards Plaintiff[']s face." *Id.* ¶ 21.[5] Wright reported this incident to Sturgill via email, but claims that he refused to address it. *Id.*

---

[5] It is unclear whether the Amended Complaint meant to state that Powers "made [a] threatening move towards" Wright, or Powers "made threatening move[s] towards" Wright.

Additionally, on or about March 25, 2009, Wright "tried to address the hostility and threats made by Powers with Ahern-Brown," but "received no response to the specific disciplinary situation with Powers." *Id.* ¶ 22.

Wright met with Sturgill and Ahern-Brown on or about March 31, 2009, and "expressed her concerns about the lack of communication, disrespect, and openly hostile and threatening behavior from Sturgill, Morris, Collins, and Powers." *Id.* ¶ 23. Among other things, she complained about (a) the lack of an update about "any changes that had taken place while she was absent from work on medical leave"; (b) the lack of response from Sturgill to her emails concerning Powers; (c) Morris and Collins being "allowed to go against the chain of command" and not being "held accountable for their failure to follow the SOPs"; and (d) Morris and Collins' statements that "that they were going to be taking over the positions held by Wright and Crawford." *Id.* According to Wright, Sturgill and Ahern-Brown's "only substantive response" was to offer Wright a newly created position at DSS, which Wright refused. *See id.* ¶ 24.

Immediately thereafter, Ahern-Brown "instructed Sturgill to document everything that Wright did from that point forward," and "told Wright that if Ahern-Brown continued to get complaints about Wright, Ahern-Brown would either (1) reprimand and/or terminate Wright's employment or, alternatively, (2) Wright would have to accept the transfer to the newly created position." *Id.* ¶ 25. Wright asserts that she advised Ahern-Brown that she "was well aware that Sturgill and Ahern-Brown were trying to remove Wright and Crawford from their positions," in order to allow their positions to be given instead "to Caucasians (Morris and Collins)." *Id.* ¶ 26.

In April 2009, Wright received multiple emails from Sturgill, urging her to accept the newly created position. *Id.* ¶ 27. Subsequently, Wright was "subjected to more humiliating,

embarrassing, and offensive treatment at the DSS," including, among other things, having her own subordinates "openly encouraged to go directly to Sturgill for everything they needed," and having Sturgill overlook purported misconduct and errors by Morris, Collins, and Powers that Wright had reported to him. *Id.* ¶ 28.

At Wright's request, she met again with Sturgill and Ahern-Brown on or about May 28, 2009, to discuss her concerns about Morris's performance. *Id.* ¶ 29. Instead, Sturgill and Ahern-Brown used the meeting as an opportunity to encourage Wright to resign or take another position, which Wright again declined. *Id.* ¶ 30. According to Wright, once it became clear that she would neither resign nor accept another position, Sturgill and Ahern-Brown would not support Wright regarding the purported disciplinary issues involving other DSS employees, including Morris, Collins, and Powers. *Id.* ¶ 31.

Wright received a mid-cycle evaluation around July 2009, in which she received a "Needs Improvement" rating and therefore was placed on a performance improvement plan. *Id.* ¶ 32. According to Wright, Sturgill indicated that the mid-cycle evaluation was based not upon his own observations, but rather upon information from Morris and Collins. *Id.* ¶ 33.

On or about November 11, 2009, Wright took a leave of absence from DSS. *Id.* ¶ 35. As with her prior leave of absence, the parties disagree as to whether Wright was on leave pursuant to the FMLA during that time. *Compare* Am. Compl. ¶¶ 35-38 *and* Opp. at 16-17 (stating that Wright took FMLA leave beginning in November 2009) *with* Def. Mem. at 24 (stating that Wright had exhausted her FMLA leave earlier in the year and thus "was not entitled to FMLA leave when she took leave again on November 11, 2009").

According to Wright, her physician had advised her to take a medical leave, after she sought counseling and treatment for stress, depression, and stomach problems. Am. Compl. ¶ 34. On or about November 24, 2009, while on leave, Wright received a letter from Ahern-Brown instructing her to report to work on December, 1, 2009, and stating that a failure to do so would result in disciplinary action. *Id.* ¶ 36. On or about December 8, 2009, Wright received a second, similar letter, instructing her to report to work by December 15, 2009, and raising the possibility of termination if she failed to report. *Id.* ¶ 37.

Wright also alleges that, while on FMLA leave, she "received several harassing telephone calls from Ahern-Brown regarding [her] return to work." *Id.* ¶ 38. Further, she complains that in late 2009, when Sturgill and Ahern-Brown learned that Wright was filing an employment discrimination charge, they "increased their harassment" of her, including by: (a) "instructing other DSS employees not to associate with or assist Wright with threats and intimidation"; (b) "removing DSS employees from Wright's supervision"; and (c) calling and sending letters to Wright's home while she was on the alleged FMLA leave of absence, instructing her to return to work and threatening disciplinary action if she failed to do so. *Id.* ¶ 39.

Wright submitted a Charge of Discrimination form, dated December 26, 2009, to both the Maryland Commission on Human Relations and the U.S. Equal Employment Opportunity Commission ("EEOC"). *Id.* ¶ 42; ECF 14-2 (Charge form). It stated, in part, ECF 14-2:

> Since approximately December 2008, I have been subjected to harassment and intimidation in an effort to remove me from my position. On March 31, 2009, I was offered a newly created position which I refused to take. On July 9, 2009, I received a negative performance evaluation. My employment has been threatened by the Director, Kerry Ahern-Brown. Another Black supervisor is being treated in the same manner for also refusing to give up her position.

* * *

I believe I have been discriminated against in violation of Title VII of the Civil Rights Act of 1964, as amended, regarding harassment and intimidation because of my race, Black. I further believe my employer's actions are in retaliation for my involvement in a protected activity in violation of Section 704(a) of the statute.

The Charge of Discrimination form includes ten check-box options where a petitioner can indicate one or more grounds of the alleged discrimination. Wright selected the boxes labeled "RACE" and "RETALIATION"; she did not select any of the other options, including "SEX." *Id.* On the form, Wright alleged that the discrimination occurred between December 6, 2008, and November 27, 2009, and checked the box for "CONTINUING ACTION." *Id.*

The EEOC investigated Wright's complaint and, on March 6, 2012, it issued a Determination. According to Wright, the EEOC found reasonable cause to believe that DSS, Sturgill, and Ahern-Brown had subjected her to unlawful discrimination, harassment, intimidation, and retaliation. Am. Compl. ¶ 42 (citing *id.* Ex.1, EEOC's Determination).[6] The EEOC issued a right-to-sue notice dated September 12, 2012. *See id.* (citing Am. Compl. Ex.2, EEOC Notice of Right to Sue).

In January 2012, Wright interviewed at DSS for the position of "Human Service Administrative II." *Id.* ¶ 40. According to Wright, only four individuals were qualified for the job: three African-Americans, including Wright, all of whom interviewed for the position, and a Caucasian, who declined to do so despite encouragement from Ahern-Brown. *See id.* ¶¶ 40-41.

---

[6] As discussed, *infra*, documents attached to the Amended Complaint and integral to it may be considered on a Rule 12(b)(6) motion. *See Sec'y of State For Def. v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007) (explaining that, in reviewing a motion under Rule 12(b)(6), a court "may consider documents attached to the complaint"). A review of the Determination, appended to the Amended Complaint, makes clear that the EEOC made no finding as to Ahern-Brown and Sturgill; its Determination pertained only to DSS.

Yet, none of the African-American candidates was hired. *Id.* ¶ 41. Wright posits that DSS lowered the job standards and later hired a Caucasian for the position. *Id.*[7]

This suit followed on December 7, 2012, within 90 days of the EEOC's right-to-sue letter, dated September 12, 2012. *See* ECF 8-4.

## Discussion

### A. Standard of Review

Defendants' Motion is styled as a motion to dismiss under Fed. R. Civ. P. 12(b)(6) or, in the alternative, for summary judgment pursuant to Fed. R. Civ. P. 56. *See* Def. Mot. at 1; Def. Mem. at 5-6. Several documents are appended to the Motion.

Ordinarily, a court "is not to consider matters outside the pleadings . . . when ruling on a motion to dismiss." *Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007); *see Clatterbuck*

---

[7] Wright attached her own Affidavit to the Opposition, containing factual allegations that generally do little to augment those in the Amended Complaint. *See* ECF 17-1 (Affidavit of Dawn M. Wright, dated May 17, 2013, "Wright Aff." or "Affidavit"). Among other things, the Affidavit addresses the selection process for the position of "FIA Assistant Director," for which Wright states she unsuccessfully interviewed in 2009. *Id.* ¶ 17. The Affidavit provides no details about other candidates, her qualifications, or any discrimination allegedly occurring at that time. *See id.*

Wright also asserts that she applied again for the "FIA Assistant Director" position in February 2012, raising allegations that parallel those in the Amended Complaint regarding the position of "Human Service Administrative II," for which Wright says she interviewed in January 2012. Am. Compl. ¶ 40. Specifically, both the Affidavit and Amended Complaint allege that among the four potential candidates qualified for the position, three were "African-American" or "black" and one was "Caucasian" or "white"; that the Caucasian/white candidate ultimately declined to interview for the position, despite encouragement from the Director (identified in the Amended Complaint as Ahern-Brown but in the Affidavit as Linda Webb); that, instead of offering the position to one of the African-American/black candidates, the job requirements were lowered and a white candidate was ultimately hired. *See* Wright Aff. ¶ 17; Am. Compl. ¶¶ 40-41.

Plaintiff's Opposition does not clarify the discrepancies between the Amended Complaint and the Affidavit. Thus, it is not entirely clear whether the two sets of allegations describe the same position and selection process.

*v. City of Charlottesville*, 708 F.3d 549, 557 (4th Cir. 2013). However, a motion styled in the alternative, *i.e.*, to dismiss or for summary judgment, implicates the court's discretion under Fed. R. Civ. P. 12(d) to consider matters outside of the pleadings and, in doing so, to treat the motion as one for summary judgment. *See Kensington Vol. Fire Dep't, Inc. v. Montgomery Cnty.*, 788 F. Supp. 2d 431, 436-37 (D. Md. 2011), *aff'd*, 684 F.3d 462 (4th Cir. 2012); *see* Def. Mem. at 5. A district judge has "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it." 5C Wright & Miller, *Federal Practice & Procedure* § 1366, at 159 (3d ed. 2004, 2011 Supp.). But, this discretion "should be exercised with great caution and attention to the parties' procedural rights." *Id.* at 149. In general, courts are guided by whether consideration of extraneous material "is likely to facilitate the disposition of the action," and "whether discovery prior to the utilization of the summary judgment procedure" is necessary. *Id.* at 165-67.

Where, as here, the movant expressly captions the motion "in the alternative," to dismiss or for summary judgment, and submits materials outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur; the court "does not have an obligation to notify parties of the obvious." *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998). If the court determines to treat the motion as one for summary judgment, "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d).

Nevertheless, summary judgment is ordinarily inappropriate "where the parties have not had an opportunity for reasonable discovery." *E. I. du Pont de Nemours & Co. v. Kolon Indus.,*

*Inc.*, 637 F.3d 435, 448 (4th Cir. 2011). In that circumstance, however, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party had made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996)).

To raise adequately the issue that discovery is needed, the non-movant typically must file an affidavit or declaration pursuant to Rule 56(d) (formerly Rule 56(f)), explaining why, "for specified reasons, it cannot present facts essential to justify its opposition" without needed discovery. Fed. R. Civ. P. 56(d); *see Harrods*, 302 F.3d at 244-45 (discussing affidavit requirement of former Rule 56(f)). "'Rule 56(d) affidavits cannot simply demand discovery for the sake of discovery.'" *Hamilton v. Mayor & City Council of Baltimore*, 807 F. Supp. 2d 331, 342 (D. Md. 2011) (quoting *Young v. UPS*, 2011 WL 665321, at *20 (D. Md. Feb. 14, 2011)). "Rather, to justify a denial of summary judgment on the grounds that additional discovery is necessary, the facts identified in a Rule 56 affidavit must be 'essential to [the] opposition.'" *Nguyen v. CNA Corp.*, 44 F.3d 234, 242 (4th Cir. 1995) (citation omitted). A non-moving party's Rule 56 request for additional discovery is properly denied "where the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment." *Strag v. Bd. of Trs., Craven Cmty. Coll.*, 55 F.3d 943, 954 (4th Cir. 1995); *see Amirmokri v. Abraham*, 437 F. Supp. 2d 414, 420 (D. Md. 2006), *aff'd*, 266 F. App'x 274 (4th Cir. 2008), *cert. denied*, 555 U.S. 885 (2008).

To be sure, the Fourth Circuit has "not always insisted" on a Rule 56(d) affidavit. *Harrods*, 302 F.3d at 244. Although the Fourth Circuit places "'great weight'" on the Rule 56(d)

affidavit, failure to file an affidavit may be excused "if the nonmoving party has adequately informed the district court that the motion is premature and that more discovery is necessary" and the "nonmoving party's objections before the district court 'served as the functional equivalent of an affidavit.'" *Id.* at 244-45 (internal citations omitted). Moreover, a non-moving party's failure to file a Rule 56(d) affidavit cannot obligate a court to issue a summary judgment ruling that is obviously premature. *See Sager v. Hous. Com'n of Anne Arundel County*, 855 F. Supp. 2d 524, 543 n.26 (D. Md. 2012); *see also Booth v. Maryland Dept. of Public Safety & Correctional Services*, 2006 WL 1896180, at *10 (D. Md. July 7, 2006). But, if a non-moving party believes that further discovery is necessary before consideration of summary judgment, a party who fails to file a Rule 56(d) affidavit does so at his peril, because "the failure to file an affidavit . . . is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate." *Harrods*, 302 F.3d at 244 (some internal quotation marks omitted).

In her Opposition, Wright maintains that her allegations are sufficient to create a genuine issue of material fact. *See, e.g.*, Opp. at 8, 14, 16, 17, 18, 21. But, she does not argue that discovery is needed or that summary judgment would be premature. As noted, Wright attached her Affidavit of May 17, 2013 to the Opposition. Wright Aff. (ECF 17-1). The Affidavit, however, is *not* a Rule 56(d) affidavit; it makes no mention of a need for further information or discovery. *Id.* Instead, the Affidavit contains substantive allegations that, as noted earlier, do little to enhance those already raised in the Amended Complaint. *See* Note 7, *supra*.[8]

---

[8] Notably, plaintiff cites the Affidavit only once in the Opposition, in connection with the assertion that her December 2008-February 2009 leave of absence was not FMLA leave. *See* Opp. at 17. As discussed, *infra*, for purposes of ruling on the FMLA claim, it is unnecessary to resolve the parties' dispute concerning the nature of plaintiff's two leaves of absence.

Several legal issues are adequately framed by the facts alleged in the Amended Complaint. Only a portion of defendants' arguments depend on documents attached to the Motion. As discussed, *infra*, some of those documents may be considered in connection with a Rule 12(b)(6) motion to dismiss. Moreover, other documents not subject to consideration under a Rule 12(b)(6) standard are unnecessary, as the counts to which they pertain may be disposed of on other grounds. Accordingly, in the exercise of my discretion, I decline to convert the Motion to one for summary judgment and instead will treat it as a motion to dismiss.

To survive a Rule 12(b)(6) motion, a complaint must satisfy the pleading standard articulated in Fed. R. Civ. P. 8(a)(2), which requires a "short and plain statement of the claim showing that the pleader is entitled to relief." The purpose of the rule is to provide the defendant with "fair notice" of the claim and the "grounds" for entitlement to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 & n.3 (2007). That showing must consist of more than "a formulaic recitation of the elements of a cause of action" or "naked assertion[s] devoid of further factual enhancement." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citations omitted); *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013). Rather, to defeat a motion under Rule 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570; *see Iqbal*, 556 U.S. at 684 ("Our decision in *Twombly* expounded the pleading standard for 'all civil actions' . . . .") (citation omitted); *see also Epps v. JP Morgan Chase Bank, N.A.*, 675 F.3d 315, 320 (4th Cir. 2012); *Simmons v. United Mortg. & Loan Inv., LLC*, 634 F.3d 754, 768 (4th Cir. 2011). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct,

the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

"Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. "A court decides whether this standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to relief. *A Society Without A Name v. Virginia*, 655 F.3d 342, 346 (4th Cir. 2011), *cert. denied*, --- U.S. ----, 132 S.Ct. 1960 (2012). Dismissal "is inappropriate unless, accepting as true the well-pled facts in the complaint and viewing them in the light most favorable to the plaintiff, the plaintiff is unable to 'state a claim to relief . . . .'" *Brockington v. Boykins*, 637 F.3d 503, 505-06 (4th Cir. 2011) (citation omitted). *See Hartmann v. Calif. Dept. of Corr. & Rehab.*, 707 F.3d 1114, 1122 (9th Cir. 2013) ("'Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory.'") (citation omitted); *Commonwealth Prop. Advocates, LLC v. Mortg. Elec. Reg. Sys., Inc.*, 680 F.3d 1194, 1201-02 (10th Cir. 2011) ("When reviewing a 12(b)(6) dismissal, 'we must determine whether the complaint sufficiently alleges facts supporting all the elements necessary to establish an entitlement to relief under the legal theory proposed.' Dismissal is appropriate if the law simply affords no relief.") (citation omitted).

As indicated, under Rule 12(b)(6), the court must assume the truth of all well-pleaded allegations in the complaint, as well as the reasonable inferences drawn from the facts. *Albright v. Oliver*, 510 U.S. 266, 268 (1994); *Brockington*, 637 F.3d at 505–06; *E.I. du Pont de Nemours*,

637 F.3d at 448. But, the court need not accept unsupported or conclusory factual allegations devoid of any reference to actual events. *United Black Firefighters v. Hirst*, 604 F.2d 844, 847 (4th Cir. 1979); *see also Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009). Nor must it accept legal conclusions couched as factual allegations, *Iqbal*, 556 U.S. at 678, or legal conclusions drawn from the facts. *See Papasan v. Allain*, 478 U.S. 265, 286 (1986); *Monroe v. City of Charlottesville*, 579 F.3d 380, 385-86 (4th Cir. 2009), *cert. denied*, --- U.S. ----, 130 S.Ct. 1740 (2010).

A motion asserting failure of the complaint to state a claim typically "does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses," *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999) (internal quotation marks omitted), unless such a defense can be resolved on the basis of the facts alleged in the complaint. In addition, a court "[o]rdinarily . . . may not consider any documents that are outside of the complaint, or not expressly incorporated therein. . . ." *Clatterbuck*, 708 F.3d at 557. In considering a challenge to the adequacy of a plaintiff's pleading, however, a court may properly consider documents "attached or incorporated into the complaint," as well as documents attached to the defendant's motion, "so long as they are integral to the complaint and authentic." *Philips v. Pitt County Memorial Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009); *see also E.I. du Pont de Nemours & Co.*, 637 F.3d at 448. To be "integral," a document must be one "that by its 'very existence, *and not the mere information it contains*, gives rise to the legal rights asserted.'" *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F. Supp. 2d 602, 611 (D. Md. 2011) (citation omitted) (emphasis in original).

Plaintiff appended two exhibits to the Amended Complaint. But, she did not include her Charge of Discrimination as an exhibit. Defendants subsequently attached it as an exhibit to their Motion. *See* ECF 14-2. The Court may consider the Charge of Discrimination, even under a Rule 12(b)(6) standard, because the Charge is integral to the Amended Complaint and no party has objected to its consideration. *See, e.g.*, *Rhodes v. Montgomery County Dept. of Corrections and Rehabilitation*, 2013 WL 791208, at *6 (D. Md. Mar. 1, 2013) (a court may consider a charge of discrimination attached to motion to dismiss where the charge is integral to the complaint and where its authenticity is undisputed); *Betof v. Suburban Hosp., Inc.*, 2012 WL 2564781, at *3 n.6 (D. Md. June 29, 2012) (same); *White v. Mortgage Dynamics, Inc.*, 528 F. Supp. 2d 576, 579 (D. Md. 2007) (a court may consider a charge of discrimination attached to motion to dismiss where charge was incorporated by reference, integral to the complaint, and no party objected).

### B. Plaintiff's Amended Complaint

#### 1. Count I: Title VII discrimination claim (against DSS)

In Count I, plaintiff alleges that DSS engaged in "unlawful discrimination based on race, color, and gender in violation of Title VII of the Civil Rights Act of 1964," 42 U.S.C. §§ 2000e *et seq.*, as amended. *See* Am. Compl. ¶¶ 44-50 (Count I). Defendants maintain that the gender-based and failure-to-promote aspects of Count I fail under Title VII's exhaustion requirement. *See* Def. Mem. at 8-10. Further, they seek dismissal of Count I because Wright has failed to allege that she suffered an adverse employment action or that any employee outside the protected class was treated differently. *See id.* at 6, 10-14.

Before filing a claim under Title VII, a "person aggrieved" by an alleged unlawful discriminatory employment practice must timely exhaust her administrative remedies. *Balas v. Huntington Ingalls Industries, Inc.*, 711 F.3d 401, 406 (4th Cir. 2013). In particular, a plaintiff must file a "charge" of discrimination with the EEOC or, in a "deferral" jurisdiction, with an appropriate state or local agency, within a specified time "after the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e–5(e)(1).[9] *See, e.g.*, *Edelman v. Lynchburg Coll.*, 300 F.3d 400, 404 & n.3 (4th Cir. 2002). Suit cannot be brought until the administrative process is exhausted. *Chacko v. Patuxent Inst.*, 429 F.3d 505, 509 (4th Cir. 2005).

The filing of an administrative charge "is not simply a formality to be rushed through so that an individual can quickly file his subsequent lawsuit." *Chacko*, 429 F.3d 505 at 510. Rather, "the charge itself serves a vital function in the process of remedying an unlawful employment practice." *Balas*, 711 F.3d at 407. In particular, "[t]he exhaustion requirement ensures that the employer is put on notice of the alleged violations so that the matter can be resolved out of court if possible." *Miles v. Dell, Inc.*, 429 F.3d 480, 491 (4th Cir. 2005); *see Balas*, 711 F.3d at 406-07 (exhaustion of EEOC administrative process "notifies the charged party of the asserted violation" and "brings the charged party before the EEOC and permits

---

[9] A deferral jurisdiction is a state that has a law prohibiting employment discrimination on the same bases covered by the federal statutes, and authorizing a state or local agency to grant or seek relief from such discrimination. *See* 42 U.S.C. § 2000e–5(c), (d); *see, e.g.*, *Edelman v. Lynchburg Coll.*, 300 F.3d 400, 404 & n.3 (4th Cir. 2002); *Prelich v. Med. Resources, Inc.*, 813 F. Supp. 2d 654, 661-62 (D. Md. 2011). Maryland is a deferral state under Title VII; the Maryland Commission on Civil Rights, formerly known as the Maryland Commission on Human Relations, is the applicable state enforcement agency. *See* Def. Mem. at 9 n.2; 29 C.F.R. § 1601.74 (listing qualifying state enforcement agencies); *Prelich*, 813 F. Supp. 2d at 661; *see also EEOG v. R & R Ventures*, 244 F.3d 334, 338 n.* (4th Cir. 2001).

effectuation of the [Civil Rights] Act's primary goal, the securing of voluntary compliance with the law") (citations and quotation marks omitted). An employee who does not comply with the administrative procedures outlined above has failed to exhaust administrative remedies and therefore is barred from filing suit in federal court. *See, e.g.*, *Miles*, 429 F.3d at 491; *Bryant v. Bell Atlantic Maryland, Inc.*, 288 F.3d 124, 132 (4th Cir. 2002).

The exhaustion requirement is jurisdictional. *Balas*, 711 F.3d at 406 ("[F]ederal courts lack subject matter jurisdiction over Title VII claims for which a plaintiff has failed to exhaust administrative remedies."); *Jones v. Calvert Grp., Ltd.*, 551 F.3d 297, 300-01 (4th Cir. 2009). Facts showing the existence of subject matter jurisdiction "must be affirmatively alleged in the complaint." *Pinkley, Inc. v. City of Frederick*, 191 F.3d 394, 399 (4th Cir. 1999).

Of import here, "[t]he scope of the plaintiff's right to file a federal lawsuit [under Title VII] is determined by the . . . contents" of the charges filed by the plaintiff with the EEOC or corresponding state agency during the process of exhaustion. *Jones*, 551 F.3d at 300 (citation omitted). "'Only those discrimination claims stated in the initial charge, those reasonably related to the original complaint, and those developed by reasonable investigation of the original complaint may be maintained in a subsequent . . . lawsuit.'" *Id.* (citation omitted); *see Miles*, 429 F.3d at 491 (an EEOC charge "'does not strictly limit a Title VII suit which may follow; rather, the scope of the civil action is confined only by the scope of the administrative investigation that can reasonably be expected to follow the charge of discrimination'") (quoting *Bryant*, 288 F.3d at 132). The Fourth Circuit has said that "a plaintiff fails to exhaust his administrative remedies where . . . his administrative charges reference different time frames, actors, and discriminatory conduct than the central factual allegations in his formal suit."

*Chacko*, 429 F.3d at 506; *accord Clarke v. DynCorp Intern. LLC*, --- F. Supp. 2d ----, 2013 WL 4495817, at *3 (D. Md. Aug. 20, 2013) (Motz, J.).

"A charge is acceptable only if it is 'sufficiently precise to identify the parties, and to describe generally the action or practices complained of.' 29 C.F.R. § 1601.12(b) (2004)." *Chacko*, 429 F.3d at 508. Although courts "recognize that EEOC charges often are not completed by lawyers and as such must be construed with utmost liberality," courts are "not at liberty to read into administrative charges allegations they do not contain." *Balas*, 711 F.3d at 408 (citations and quotation marks omitted). As the Fourth Circuit recently explained, "persons alleging discrimination have a different form of recourse if they determine that their initial charge does not read as they intended: they may, as [the plaintiff] did, file an amended charge with the EEOC." *Id.* (citing 29 C.F.R. § 1601.12(b)).

As discussed, *infra*, the exhaustion requirement is relaxed for a Title VII retaliation claim, such as the one plaintiff brings in Count III. *See Jones*, 551 F.3d at 301-04. But, because Count I is a discrimination claim and not a retaliation claim, the typical exhaustion requirements apply. *See Simmington v. Gates*, 2010 WL 1346462, at *8 (D. Md. Mar. 30, 2010) (Chasanow, J.) (contrasting "substantive Title VII claims" with Title VII retaliation claims and explaining that "a plaintiff is not required to exhaust administrative remedies for retaliation claims").

In this case, defendants contend that plaintiff has failed to exhaust her administrative remedies as to the sex discrimination claim and the failure-to-promote aspect of her employment discrimination claim. *Id.* 8-10. In response, plaintiff concedes that she failed to exhaust administrative remedies as to the gender discrimination claim, but maintains that the race-based and failure-to-promote aspects of her Title VII claim remain viable. *See* Opp. at 3-4.

To proceed on a failure to promote claim, a plaintiff must show that: "(1) she is a member of a protected group, (2) she applied for the position in question, (3) she was qualified for that position, and (4) the defendants rejected her application under circumstances that give rise to an inference of unlawful discrimination." *Anderson v. Westinghouse Savannah River Co.*, 406 F.3d 248, 268 (4th Cir. 2005). Because plaintiff's Amended Complaint only refers to one position for which she applied, the failure-to-promote aspect of plaintiff's Title VII claim in Count I is based entirely upon her candidacy for the position of "Human Service Administrative II," for which she interviewed in January 2012. Am. Compl. ¶ 40.

Notably, plaintiff's original Complaint (ECF 5), filed on December 7, 2012, made no reference to any failure by DSS to promote her, either in early 2012 or at any other time. *See id.*[10] Nor does plaintiff's Charge of Discrimination mention any failure to promote, let alone any failure to promote plaintiff to the "Human Service Administrative II" position in 2012. Because plaintiff filed the EEOC charge in 2009, more than two years before the failure-to-promote claim arose, she obviously could not have done so. However, plaintiff does not indicate either that she amended the Charge of Discrimination or attempted to do so. Pursuant to an EEOC regulation, a petitioner may supplement or amend a charge after it is filed so as to include "amendments alleging additional acts which constitute unlawful employment practices related to or growing

---

[10] Presumably, plaintiff added to the Amended Complaint the allegations about the 2012 failure to promote in response to DSS's argument in its first motion to dismiss that plaintiff failed to identify any adverse employment action. *See* ECF 5 (DSS's "Memorandum in Support of Motion to Dismiss or in the Alternative Motion for Summary Judgment") at 6-10 (arguing that plaintiff's Title VII race discrimination must be dismissed because plaintiff failed to identify an adverse employment action) and 14-17 (arguing that plaintiff's Title VII retaliation claim should be dismissed because plaintiff failed to allege an adverse employment action or that she suffered any harm or injury due to retaliation).

out of the subject matter of the original charge." 29 C.F.R. § 1601.12(b); *see also Balas*, 711 F.3d at 408; *Murphy-Taylor v. Hofmann*, --- F. Supp. 2d ----, 2013 WL 4924031, at \*12 (D. Md. Sept. 12, 2013) (noting that plaintiff filed a supplemental charge with the EEOC while her original charge was pending). There is no suggestion that plaintiff lacked an opportunity either to amend her EEOC Charge of Discrimination or instead to file a new charge, prior to filing her original Complaint in December 2012. The Fourth Circuit has held that a failure to amend a charge of discrimination constitutes a failure to exhaust administrative remedies. *See Sloop v. Memorial Mission Hospital, Inc.*, 198 F.3d 147, 149 (4th Cir. 1999) (plaintiff who took no official action to amend the charge of discrimination failed to exhaust administrative remedies with respect to claim omitted from the original charge).

To be sure, certain claims absent from a charge of discrimination may be pursued in a subsequent lawsuit, if they are "reasonably related to the original complaint" or "developed by reasonable investigation of the original complaint." *See Jones*, 551 F.3d at 300. But, as noted, a plaintiff has failed to exhaust administrative remedies where a charge of discrimination references "different time frames, actors, and discriminatory conduct" than the allegations found in a complaint. *See Chacko*, 429 F.3d at 506.

Under that standard, the claim concerning the failure to promote Wright in 2012 does not meet the exhaustion requirement. In particular, that alleged adverse employment action occurred during a markedly different time frame and involved a discrete form of conduct—failure to promote—that is distinct from the conduct found in plaintiff's 2009 Charge of Discrimination. Although Ahern-Brown allegedly urged one candidate to interview for the position of Human Service Administrative II, her role is far from clear, nor is it apparent which employees oversaw

the selection process.[11] As a result, this plainly is not a case in which "the similarities between [plaintiff's] administrative and judicial narratives make clear that [defendants were] afforded ample notice of the allegations" against them. *See Syndor*, 681 F.3d at 595.

Moreover, courts have specifically concluded that a failure-to-promote allegation is a separate basis for relief, for which administrative exhaustion is required. *See, e.g.*, *Alston v. Astrue*, 2012 WL 665982, at *4 (D. Md. Feb. 28, 2012) (concluding that plaintiff's "failure-to-promote claims may not proceed before this Court because they were not included in her EEO complaints," and explaining that "a discriminatory failure to promote is not the type of claim that would fall within the 'scope of the administrative investigation that can reasonably be expected to follow' [plaintiff's] initial charges of discrimination") (quoting *Chisholm*, 665 F.2d at 491); *see also, e.g.*, *Chacko*, 429 F.3d at 509 ("A claim will also typically be barred if the administrative charge alleges one type of discrimination—such as discriminatory failure to promote—and the claim encompasses another type—such as discrimination in pay and benefits."); *Lawson v. Burlington Indus., Inc.*, 683 F.2d 862, 863-64 (4th Cir. 1982) (where plaintiff's EEOC charge alleged only a discriminatory layoff claim, court lacked jurisdiction over plaintiff's discriminatory failure-to-rehire claim); *Herbig v. Martin*, 2013 WL 3146937, at

---

[11] Even if I were to consider Wright's Affidavit—which plaintiff's Opposition does not cite in connection with the Title VII counts—its allegations would do nothing to save the failure-to-promote claim. As explained, *supra*, it is not clear whether the selection process for the position of "FIA Assistant Director" described in Wright's Affidavit is the same as that for the position of "Human Service Administrative II" that Wright alleged in the Amended Complaint. If the position described in the Affidavit is the same position, or another within DSS, the Affidavit indicates that various employees, but not Ahern-Brown or Sturgill, were on the interview panel, and further suggests that Ahern-Brown may have no longer been Director of DSS by early 2012. *See* Wright Aff. ¶ 17 (identifying the "Director" as Linda Webb and referring to "things that happened during Kerry [Ahern-Brown's] tenure").

*5 (D. Md. June 18, 2013) (indicating that failure-to-promote allegation amounts to an "entirely different bas[i]s for relief" than allegation for discrimination in pay and benefits) (citing *Evans*, *supra*, 80 F.3d at 963-64); *Sawyers v. United Parcel Service*, 946 F.Supp.2d 432, 441 (D. Md. 2013) (where administrative charge alleged only supervisor harassment, allegations concerning co-worker harassment not exhausted) (citing *Chacko*, 429 F.3d at 511); *Jones v. Republic Services, Inc.*, 2011 WL 6000761, at *3 (D. Md. Nov. 29, 2011) (noting that "denial of an alternative schedule [is] considerably different from the discriminatory behavior alleged in the administrative charge—suspension and termination" and concluding that alternative schedule claim not exhausted).   Accordingly, because plaintiff failed to exhaust her only cognizable failure-to-promote claim, this Court lacks subject matter jurisdiction over that claim.

### b.  Proof under Title VII

In general, Title VII prohibits an employer from taking "adverse employment action" against an employee on a prohibited basis. *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 375 (4th Cir. 2004).  In general, there are "two avenues" at trial by which a plaintiff may prove that an adverse employment action amounts to intentional employment discrimination.  *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 284 (4th Cir. 2004) (en banc), *cert. denied*, 543 U.S. 1132 (2005).

The first avenue is to offer evidence of discrimination, under "'ordinary principles of proof.'"  *Burns v. AAF-McQuay, Inc.*, 96 F.3d 728, 731 (4th Cir. 1996) (citation omitted).  To satisfy ordinary principles of proof, a plaintiff at trial must provide direct or circumstantial evidence of discrimination that is sufficiently probative to meet her burden of proof.  *See Evans*, 80 F.3d at 959.

The second such avenue available to the plaintiff at trial is to follow the burden-shifting approach first articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).[12] Under this approach, the plaintiff must first establish a "prima facie case of discrimination." *Laing v. Fed. Exp. Corp.*, 703 F.3d 713, 719 (4th Cir. 2013); *see Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 294 (4th Cir. 2010). Although the precise formulation of the required prima facie showing will vary in "differing factual situations," *McDonnell Douglas*, 411 U.S. at 802 n.13, the plaintiff in an employment discrimination suit is generally required to show that the employer took adverse action against the plaintiff "under circumstances which give rise to an inference of unlawful discrimination." *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

If the plaintiff establishes a prima facie case, "a presumption of illegal discrimination arises, and the burden of production shifts to the employer" to produce evidence of a legitimate, non-discriminatory reason for its adverse employment action. *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 336 (4th Cir. 2011); *see Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000). "If the defendant carries this burden of production," the plaintiff must then prove, by a preponderance of the evidence, "that the proffered reason was not the true reason," and that the

---

[12] *McDonnell Douglas* involved a claim of racial discrimination in hiring under Title VII of the Civil Rights Act of 1964. However, the burden-shifting methodology it endorsed has been adapted for use in other statutory contexts. *See, e.g.*, *Yashenko v. Harrah's NC Casino Co., LLC*, 446 F.3d 541, 550-51 (4th Cir. 2006) (applying *McDonnell Douglas* framework to claim of employer retaliation for taking FMLA-protected leave); *see also Young v. United Parcel Service, Inc.*, 707 F.3d 437, 445-46 (4th Cir. 2013) (applying *McDonnell Douglas* framework to Title VII sex discrimination claim); *Raytheon Co. v. Hernandez*, 540 U.S. 44, 50-52 & n.3 (2003) (applying *McDonnell Douglas* framework in employment discrimination case under Americans with Disabilities Act, 42 U.S.C. §§ 12101 *et seq.*).

plaintiff "has been the victim of intentional discrimination." *Burdine*, 450 U.S. at 255–56; *see Reeves*, 530 U.S. at 143.

These two methods of proof establish the standards to prove intentional employment discrimination at trial. *Hill*, 354 F.3d at 284-85. At the motion to dismiss stage, however, they serve to inform a court's evaluation of the allegations. Accordingly, in a Title VII discrimination claim, "a complaint in an employment discrimination lawsuit [need not] contain specific facts *establishing* a prima facie case of discrimination under the framework set forth in *McDonnell Douglas.*" *Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506, 508 (2002) (emphasis added). Rather, as with any other claim falling within the purview of Rule 8(a), "to survive a motion to dismiss, the complaint must 'state a plausible claim for relief' that 'permit[s] the court to infer more than the mere possibility of misconduct' based upon 'its judicial experience and common sense.'" *Coleman v. Maryland Court of Appeals,* 626 F.3d 187, 190 (4th Cir. 2010), *aff'd*, --- U.S.----, 132 S.Ct. 1327 (2012) (citation omitted).

### c. Plaintiff's "adverse employment action" allegations

As noted, Title VII serves to prevent an employer from taking an "adverse employment action" against an employee on a prohibited basis. *James*, 368 F.3d at 375. The Fourth Circuit has explained: "An adverse employment action is a discriminatory act that adversely affects the terms, conditions, or benefits of a plaintiff's employment." *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 219 (4th Cir. 2007) (internal quotation marks, citation, and alterations omitted). An "adverse employment action" is one that "'constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Hoyle,* 650 F.3d at

337 (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)). Typically, an adverse employment action has been found in cases of "discharge, demotion, decrease in pay or benefits, loss of job title or supervisory responsibility, or reduced opportunities for promotion." *Boone v. Goldin,* 178 F.3d 253, 255 (4th Cir. 1999); *see also James,* 368 F.3d at 376. However, "Title VII does not remedy everything that makes an employee unhappy." *Jeffers v. Thompson,* 264 F. Supp. 2d 314, 329 (D. Md. 2003).

Setting aside the failure-to-promote claim that plaintiff failed to exhaust, defendants assert that plaintiff's remaining allegations—which include low performance ratings, pressure to accept an internal transfer, and other conduct—are insufficient to constitute an adverse employment action under Title VII. Def. Mem. at 10-13. Plaintiff counters that she has sufficiently alleged an adverse employment action, relying primarily on a "downgraded performance evaluation," a "shift in the attitude and behavior" of her co-workers, and a loss of certain responsibilities. *See* Opp. at 4-7. Specifically, plaintiff points out that she has "alleged that she received a downgraded performance evaluation for the first half of calendar year 2009." *Id.* at 4; *see* Am. Compl. ¶ 32.

Performance evaluations ordinarily do not to rise to the level of an "adverse employment action." *See Amirmokri v. Abraham*, 437 F. Supp. 2d 414, 423 (D. Md. 2006) (indicating that letter of reprimand is not an adverse employment action); *Jeffers*, 264 F. Supp. 2d at 330 ("Like a reprimand, a poor performance rating does not in itself constitute an adverse employment action. 'Rather, it is a mediate step, which, if relied upon for a true adverse employment action (e.g., discharge, demotion, etc.) becomes relevant evidence.'" (citations omitted)). Nevertheless, a "downgrade of a performance evaluation *could* [a]ffect a term, condition, or benefit of

employment if it has a tangible effect on the terms or conditions of employment." *James*, 368 F.3d at 377 (internal quotation marks omitted; emphasis in *James*). "However, a poor performance evaluation 'is actionable only where the employer subsequently uses the evaluation as a basis to detrimentally alter the terms or conditions of the recipient's employment.' An evaluation merely causing a loss of prestige or status is not actionable." *Id.* (quoting *Spears* v. *Mo. Dep't of Corr. & Human Res.*, 210 F.3d 850, 854 (8th Cir. 2000); further citation omitted).

As noted, plaintiff failed to exhaust administrative remedies regarding her claim that, based on her race, she did not receive the job for which she interviewed in January 2012. Moreover, the Amended Complaint lacks any allegation that connects any negative evaluation to DSS's alleged failure to promote plaintiff to the position for which she interviewed in January 2012, or otherwise. An unsupported suggestion that a negative review dating from mid-2009 might have affected future opportunities, including a position for which plaintiff interviewed two and a half years after the review, does not amount to a plausible allegation that DSS used the 2009 evaluation "as a basis to detrimentally alter the terms or conditions" of plaintiff's employment. *See James*, 368 F.3d at 377 (citation and quotation marks omitted). Accordingly, even assuming that I may consider the failure to promote plaintiff in 2012 in connection with plaintiff's allegations concerning the 2009 performance review, the 2012 events cannot salvage plaintiff's allegations of an adverse employment action.

Nor can plaintiff bolster her allegation of an adverse employment action with generalized claims of a "discriminatory attitude and behavior" on the part of subordinates. *See* Opp. at 5. Disparaging remarks by a supervisor, let alone by a mere subordinate, are insufficient to constitute a materially adverse employment action. *See, e.g.*, *Jones-Davidson v. Prince George's*

*County Community College*, 2013 WL 5964463, at *4 (D. Md. Nov. 7, 2013) (collecting cases);

*Cepada v. Bd. of Educ. of Balt. Cnty.*, 814 F. Supp. 2d 500, 515 (D. Md. 2011) (plaintiff's

allegations that he was "yelled at" and "'criticized'" did not constitute adverse employment

actions) (citing complaint); *Tawwaab v. Va. Linen Serv., Inc.*, 729 F. Supp. 2d 757, 784 (D. Md.

2010) ("demeaning and disparaging comments by a supervisor . . . do not constitute an adverse

employment action"); *Blount v. Dep't of Health & Human Servs.*, 400 F. Supp. 2d 838, 842 (D.

Md. 2004) ("disparaging remarks made by a supervisor do not state an adverse employment

action").

Likewise, plaintiff fails to allege any change to her "work duties or assignments" that is

sufficient to constitute an adverse employment action. It is undisputed that plaintiff's grade level

and salary remained constant throughout the relevant time period. *See* Def. Mem. at 12; Opp. at

5-6. However, plaintiff maintains that "her supervisory duties over Caucasian subordinates were

taken away and given to a Caucasian," Gene Powers. *See* Opp. at 5. That statement

mischaracterizes the actual allegations found in the Amended Complaint, however, which

indicate only that Powers was designated as "the unit triage person" and given unspecified

"additional duties." Am. Compl. ¶ 17.[13] Missing from the Amended Complaint are any

allegations establishing how or to what extent plaintiff's *own* responsibilities or supervisory

duties were diminished.

_____

[13] Plaintiff also alleges that Powers did not actually perform those additional "unit triage" duties, explaining that when she confronted Powers about that deficiency, he essentially denied that such a transfer of duties had occurred, telling her: "'It is not my job[.]'" *Id.* ¶ 18. Another supervisor "simply assigned someone else to do the tasks that Powers had refused to do." *Id.*

To the extent plaintiff identifies any effect on her own role and responsibilities, those changes are markedly different from ones that courts have found sufficient to constitute an adverse employment action. For instance, in *Westmoreland v. Prince George's County, Md.*, 876 F. Supp. 2d 594 (D. Md. 2012), on which plaintiff relies, *see* Opp. at 5, the district court concluded that "a genuine dispute of material fact exists regarding whether the transfer had a significant detrimental effect on the conditions of [the plaintiff's] employment." *Id.* at 605. The court observed that, unlike the plaintiff's prior position, which involved "supervisory and classroom instruction functions," the plaintiff's new role required her to "perform 'routine fire fighter type functions,'" including "'responding to fires [and] to medical emergencies.'" *See id.* at 599, 605-06 (record citation omitted). *See also, e.g.*, *Jones-Davidson*, 2013 WL 5964463, at *4 ("courts have held that any change in job responsibilities must be substantial in order to rise to the level of adverse employment action"); *Thorn v. Sebelius*, 766 F. Supp. 2d 585, 599 (D. Md. 2011) (Chasanow, J.) ("'[O]ther circuits have held that changes in assignments or work-related duties do not ordinarily constitute adverse employment decisions if unaccompanied by a decrease in salary or work hour changes.'") (quoting *Mungin v. Katten Muchin & Zavis*, 116 F.3d 1549, 1557 (D.C. Cir. 1997)); *Tawwaab*, 729 F. Supp. 2d at 784 ("[A] change in job responsibilities . . . does not constitute a materially adverse action if the new tasks 'are not dirtier, more arduous, less prestigious, objectively inferior, or possessing of any analogous attribute.'") (quoting *Stephens v. Erickson*, 569 F.3d 779, 791 (7th Cir. 2009)).

Other cases on which plaintiff relies are similarly distinct, as plaintiff's own descriptions of those cases reflect. *See* Opp. at 6 (citing *Patterson v. Ind. News., Inc.*, 589 F.3d 357, 365 (7th Cir. 2009) (concluding that employee's "transfer from editorial writing back to copy editing

qualifies as an adverse employment action," and explaining that a "'dramatic downward shift in skill level required to perform job responsibilities can rise to the level of an adverse employment action'") (quoting *Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir. 1996); further citation and quotation marks omitted); *Stewart v. Ashcroft*, 352 F.3d 422, 426-27 (D.C. Cir. 2003) (finding adverse employment action based on failure to promote U.S. Department of Justice attorney from Senior Litigation Counsel to Chief of Environmental Crimes Section, explaining that employee was "denied his supervisor's job"); *Jones v. Okla. City Pub. Schs.*, 617 F.3d 1273, 1275-76, 1280 (10th Cir. 2010) (finding adverse employment action where employee's position as Executive Director of Curriculum and Instruction was eliminated, employee returned to prior role as an elementary school principal, employee's vacation benefits were curtailed and per diem rate decreased; and, although salary remained constant for one year, was decreased by $17,000 the following year)).

Notably, plaintiff has already had an opportunity to amend her allegations in response to an earlier dispositive motion. Among other arguments raised in connection with DSS's first motion to dismiss, DSS asserted that, to constitute an adverse employment action, a negative performance evaluation must be used by the employer "as a basis to detrimentally alter the terms or conditions of the recipient's employment." *See* ECF 5-1 at 7 n.2. Even with notice of this potential deficiency, plaintiff's subsequent Amended Complaint fails to present adequately such an allegation.[14]

---

[14] Because I conclude that plaintiff has not adequately pleaded an adverse employment action, I need not reach defendants' argument based on plaintiff's failure to identify a similarly-situated comparator. *See* Def. Mem. at 13-14. I note that the Fourth Circuit has recently reiterated that, "notwithstanding the virtues of comparator evidence, it of course remains the case

<u>2. Count II: 42 U.S.C. § 1981 (against all defendants)</u>

Count II sets forth a claim against all defendants, alleging "unlawful discrimination based on race and color in violation of 42 U.S.C. § 1981." *See* Am. Compl. ¶¶ 51-57 (Count II). Section 1981 prohibits, *inter alia*, "discrimination in employment on the basis of race." *Yashenko*, *supra*, 446 F.3d at 551-52. *See Johnson v. Ry. Express Agency, Inc.*, 421 U.S. 454, 459-60 (1975) ("§ 1981 affords a federal remedy against discrimination in private employment on the basis of race"). In relevant part, 42 U.S.C. § 1981(a) provides: "All persons within the Jurisdiction of the United States shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens." Section 1981(b) states: "For purposes of this section, the term 'make and enforce contracts' includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."[15]

---

that a plaintiff is 'not required as a matter of law to point to a similarly situated . . . comparator in order to succeed' on a discrimination claim." *Laing*, *supra*, 703 F.3d at 720 (quoting *Bryant v. Aiken Reg'l Med. Ctrs., Inc.*, 333 F.3d 536, 545 (4th Cir. 2003)). Nevertheless, "a plaintiff who bases her allegations entirely upon a comparison to an employee from a non-protected class must demonstrate that the comparator was 'similarly situated' in all relevant respects." *Sawyers v. United Parcel Service*, 946 F. Supp. 2d 432, 442 n.10 (D. Md. 2013) (quotation marks omitted; citing, *inter alia*, *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 258, (1981)).

[15] Section 1981(b) was enacted as part of the Civil Rights Act of 1991 in order to overrule legislatively the Supreme Court's holding in *Patterson v. McLean Credit Union*, 491 U.S. 164 (1989), to the effect that § 1981 applied "only to the formation of a contract" and not "to conduct by the employer after the contract relation has been established, including breach of the terms of the contract or imposition of discriminatory working conditions." *Id.* at 176-77. *See generally CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 449-51 (2008) (discussing post-*Patterson* enactment of § 1981(b)).

### a.  Claims against DSS

According to defendants, Count II should be dismissed as to DSS because, *inter alia*, as a Maryland state agency DSS is entitled to Eleventh Amendment immunity for § 1981 claims.  *See* Def. Mem. at 6, 15-16.  In her Opposition, plaintiff concedes that DSS should be dismissed from Count II on grounds of Eleventh Amendment immunity.  Opp. at 8 n.1.

### b.  Claims against the individual defendants

Defendants urge dismissal of Count II as to the individual defendants because Wright fails to allege any official policy or custom of discrimination, and because the Amended Complaint lacks any factual allegations concerning the individual defendants in connection with Count II.  *See* Def. Mem. at 15, 17-18.  Regarding the first argument, defendants' logic proceeds as follows: (1) "when suit is brought against a state actor, § 1983 is the 'exclusive federal remedy for violation of the rights guaranteed in § 1981'" (citations and internal quotation marks omitted); (2) the requirement under § 1983 that a plaintiff show an "official policy or custom" of discrimination also applies to a § 1981 action against individual state actors; (3) because the Amended Complaint does not allege an "official policy or custom" of discrimination, the § 1981 count must fail.  *See* Def. Mem. at 17.

In response, plaintiff denies that she has sued the individual defendants in their official capacities, insisting instead that she brought personal-capacity claims against them.  Opp. at 11. The Fourth Circuit explained in *Andrews v. Daw*, 201 F.3d 521, 523 (4th Cir. 2000):

> While "[p]ersonal capacity suits seek to impose personal liability upon a government official for actions he takes under color of state law," official capacity suits "generally represent only another way of pleading an action against an entity of which an officer is an agent" and in essence are "suit[s] against the entity."  Because the real party in interest in an official-capacity suit is the entity, a plaintiff can only recover damages from the entity itself, in contrast to a

personal-capacity suit, in which a plaintiff can seek a judgment against the official's personal assets. Furthermore, different legal theories of liability are required for the plaintiff, and different defenses are available to the defendant, in a personal-capacity action than in an official-capacity action. These differences indicate that a government official in his official capacity does not represent "precisely the same legal right" as he does in his individual capacity.

In the Amended Complaint, plaintiff did not specify whether defendants were being sued in their official or their personal capacities. Under that circumstance, a court must scrutinize a plaintiff's allegations to make that determination. In the analogous context of claims under 42 U.S.C. § 1983, courts have examined "the nature of the plaintiff's claims, the relief sought, and the course of proceedings to determine whether a state official is being sued in a personal capacity." *Biggs v. Meadows*, 66 F.3d 56, 61 (4th Cir. 1995). One such factor indicative of a personal-capacity suit "might be the plaintiff's failure to allege that the defendant acted in accordance with a governmental policy or custom, or the lack of indicia of such a policy or custom on the face of the complaint." *Id.* As noted, plaintiff has made no such allegation here. Another factor is the "plaintiff's request for compensatory or punitive damages, since such relief is unavailable in official capacity suits." *Id.* Here, plaintiff seeks both compensatory and punitive damages from the individual defendants. *See* Am. Compl. ¶ 83. Based on these factors, I am satisfied that, as plaintiff argues in her Opposition, she has brought personal-capacity and not official-capacity claims against the individual defendants. As a result, plaintiff's failure to plead a discriminatory policy or custom does not require dismissal.

In addition, defendants note that although Count II is lodged against "all Defendants," *see* Am. Compl. at 11 (Count II), plaintiff failed to include "any specific factual allegations directed towards the individual defendants." Def. Mem. at 17. Defendants are correct that the paragraphs in the Amended Complaint pertaining to Count II do not expressly name Sturgill or Ahern-

Brown. *See* Am. Compl. ¶¶ 51-57. Nevertheless, it is sufficiently clear that the specific conduct alleged in those paragraphs, including, *inter alia*, making negative comments in Wright's personnel file, pressuring Wright to accept an internal transfer, and harassing Wright during her purported FMLA leave, are actions alleged elsewhere in the Amended Complaint to have been committed by Sturgill and Ahern-Brown, and plaintiff incorporated those assertions by reference in Count II. *See id.* Accordingly, defendants' argument is unavailing. Therefore, I decline to dismiss Count II as to the individual defendants.

### 3. Count III: Title VII retaliation claim (against DSS)

Count III of the Amended Complaint contains a retaliation claim against DSS under Title VII. *See* Am. Compl. ¶¶ 58-63 (Count III). Defendants urge dismissal of Count III because, *inter alia*, Wright failed to allege that she suffered an adverse employment action or that she suffered any harm or injury due to the allegedly retaliatory conduct. Def. Mem. at 6.

### a. Retaliation under Title VII

Title VII prohibits an employer from retaliating against an employee who exercises her Title VII rights. *See, e.g.*, *Okoli v. City of Baltimore*, 648 F.3d 216, 223 (4th Cir. 2011); *Thorn v. Sebelius*, 766 F. Supp. 2d 585, 600 (D. Md. 2011). The purpose of Title VII's antiretaliation provision is to preserve "unfettered access to statutory remedial mechanisms" for employees who fear reprisal. *Robinson v. Shell Oil Co.*, 519 U.S. 337, 346 (1997).

In order to establish a prima facie claim of retaliation under Title VII, "a plaintiff must show that (1) the plaintiff engaged in a protected activity, such as filing a complaint with the EEOC; (2) the employer acted adversely against the plaintiff; and (3) the protected activity was causally connected to the employer's adverse action." *Okoli*, 648 F.3d at 223 (citations omitted);

*see Price v. Thompson*, 380 F.3d 209, 212 (4th Cir. 2004). As with a substantive discrimination claim, the *McDonnell Douglas* framework applies at trial: "If a plaintiff 'puts forth sufficient evidence to establish a prima facie case of retaliation' and a defendant 'offers a non-discriminatory explanation' for [the adverse action], the plaintiff 'bears the burden of establishing that the employer's proffered explanation is pretext.'" *Hoyle*, *supra*, 650 F.3d at 337 (quoting *Yashenko*, 446 F.3d at 551).

As noted, a plaintiff must first establish that she engaged in protected activity, such as filing a complaint with the EEOC. *Okoli*, 648 F.3d at 223-24. As the Fourth Circuit has explained, "in the context of a retaliation claim, a 'protected activity' may fall into two categories, opposition and participation." *EEOC v. Navy Federal Credit Union*, 424 F.3d 397, 406 (4th Cir. 2005). "An employer may not retaliate against an employee for participating in an ongoing investigation or proceeding under Title VII, nor may the employer take adverse employment action against an employee for opposing discriminatory practices in the workplace." *Laughlin v. Metropolitan Washington Airports Authority,* 149 F.3d 253, 259 (4th Cir. 1998). As the Fourth Circuit has said, "[t]o fall under the protection of the opposition clause . . . behavior need not rise to the level of formal charges of discrimination. The opposition clause has been held to encompass informal protests, such as voicing complaints to employers or using an employer's grievance procedures." *Armstrong v. Index Journal Co.,* 647 F.2d 441, 448 (4th Cir. 1981) (citation omitted).

The second element of the prima facie case is an "adverse employment action." In a retaliation claim, the standard for an adverse employment action is more lenient than for a substantive discrimination claim. *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S.

53, 64 (2006) ("*Burlington Northern*") ("[T]he antiretaliation provision, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment."). In the retaliation context, a plaintiff must show that the challenged action "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 68 (quotation marks and citations omitted). Nonetheless, "[t]he anti-retaliation provision of Title VII does not protect against 'petty slights, minor annoyances, and simple lack of good manners.'" *Geist v. Gill/Kardash Partnership*, 671 F. Supp. 2d 729, 738 (D. Md. 2009) (quoting *Burlington Northern*, 548 U.S. at 68). Moreover, Title VII's "antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm." *Burlington Northern*, 548 U.S. at 67. As Judge Paul Grimm of this Court recently noted, even under the "lower bar" applicable to Title VII retaliation claims, "none of the following constitutes an adverse employment action in a retaliation claim: failing to issue a performance appraisal; moving an employee to an inferior office or eliminating the employee's work station; considering the employee 'AWOL'; or issuing a personal improvement plan, 'an "Attendance Warning,"' a verbal reprimand, 'a formal letter of reprimand,' or 'a proposed termination.'" *Wonasue v. University of Maryland Alumni Ass'n*, --- F. Supp. 2d ----, 2013 WL 6158375, at *10 (D. Md. Nov. 22, 2013) (quoting *Rock v. McHugh*, 819 F. Supp. 2d 456, 470-71 (D. Md. 2011)).

To satisfy the third element—a causal connection between the protected activity and the adverse action—a plaintiff at trial must show that "the employer [took] the adverse employment action *because* the plaintiff engaged in a protected activity." *Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998) (emphasis in original). Ordinarily,

there must exist "some degree of temporal proximity to suggest a causal connection." *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 501 (4th Cir. 2005). Therefore, a "'lengthy time lapse between the [defendant's] becoming aware of the protected activity and the alleged adverse . . . action'" often "'negates any inference that a causal connection exists between the two.'" *Id.* (citation omitted). And, "a lapse of as little as two months between the protected activity and an adverse employment action is 'sufficiently long so as to weaken significantly the inference of causation.'" *Clarke*, *supra*, 2013 WL 4495817, at *6 (quoting *King v. Rumsfeld*, 328 F.3d 145, 151 n.5 (4th Cir. 2003)). *See Price*, 380 F.3d at 213 (although period of nine to ten months between protected conduct and adverse action presented "a very close question," trier of fact could find causal connection where defendant declined to hire plaintiff "at the first available opportunity").

A three-year time lapse between the employer's awareness of the protected activity and the adverse employment action is sufficiently long that it "'negates any inference that a causal connection exists between the two.'" *Clarke*, 2013 WL 4495817, at *6 (quoting *Dowe*, 145 F.3d at 657). But, in "cases where 'temporal proximity between protected activity and allegedly retaliatory conduct is missing, courts may look to the intervening period for other evidence of retaliatory animus.'" *Lettieri v. Equant, Inc.*, 478 F.3d 640, 650 (4th Cir. 2007) (citation omitted).

Nevertheless, mere temporal proximity is not necessarily enough to create a jury issue as to causation. "'Where timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise.'" *Francis v. Booz, Allen & Hamilton, Inc.*, 452 F.3d 299, 309 (4th Cir.

2006) (citation omitted) (affirming summary judgment where the "actions that led to [plaintiff's] probation and termination began before her protected activity, belying the conclusion that a reasonable factfinder might find that [defendant's] activity was motivated by [plaintiff's] complaints"). And, pursuant to the Supreme Court's recent ruling in *University of Texas Southwestern Medical Center v. Nassar*, --- U.S. ----, 133 S.Ct. 2517, 2534 (2013), "a plaintiff making a retaliation claim under [Title VII] must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer."

### b.  Plaintiff's Title VII retaliation allegations

Regarding the first element, neither party disputes that plaintiff's filing of a Charge of Discrimination in December 2009 qualifies as a protected activity. *See* Def. Mem. at 19; Opp. at 12; *see also Price*, 380 F.3d at 212. Additionally, plaintiff argues that other actions, dating from as early as March 2009, qualify as protected conduct. *See* Opp. at 13-14. She relies in part on her allegation that, at a meeting held on March 31, 2009, she "advised Sturgill and Ahern-Brown that [she] was well aware that Sturgill and Ahern-Brown were trying to remove Wright and Crawford from their positions so that Sturgill and Ahern-Brown could give the supervisory positions currently held by African-Americans (Wright and Crawford) to Caucasians (Morris and Collins)." Am. Compl. ¶ 26. *See also id.* ¶ 59 (alleging that "Wright engaged in protected activity by . . . informing Sturgill and Ahern-Brown that she suspected unlawful discrimination within the DSS"). Viewed in the light most favorable to Wright for purposes of defendants' Motion, Wright's purported complaint to her supervisors about racial discrimination also constitutes protected conduct.

Second, plaintiff cites conduct that, in her view, qualifies as adverse employment action. The conduct alleged includes "making unwarranted negative ratings and unflattering comments in Wright's personnel file"; "unduly pressuring Wright to accept an unwanted internal transfer"; and "encouraging fellow DSS employees to demean, humiliate, and otherwise ostracize Wright." Am. Compl. ¶ 60; *see* Opp. 11-16. However, some aspects of plaintiff's allegations amount to nothing more than the "petty slights, minor annoyances, and simple lack of good manners" that the Supreme Court has said are insufficient to deter an employee from reporting discrimination. *Burlington Northern*, 548 U.S. at 68. *See, e.g.*, Am. Compl. ¶ 60.

Further, Wright alleges that she received a downgraded "Needs Improvement" performance rating in July 2009; was placed on a performance improvement plan; and was pressured, including during April and May 2009, to accept an internal transfer that she did not want. *See id.* ¶¶ 32-33, 60. Those actions, defendants maintain, do not rise to the level of an adverse employment action. *See* Def. Mem. at 20-21.[16] Significantly, Count III also identifies "failing to promote Wright" as an adverse employment action. Am. Compl. ¶ 60.

In seeking dismissal, defendants argue that the allegation of retaliatory failure to promote is beyond the scope of plaintiff's Charge of Discrimination form, and therefore should not be

---

[16] The three cases on which defendants rely all predate the Supreme Court's 2006 decision in *Burlington Northern*. *See* Def. Mem. at 20-21 (citing *Thompson v. Potomac Electric Power Co.*, 312 F.3d 645 (4th Cir. 2002); *Allen v. Rumsfeld*, 273 F. Supp. 2d 695 (D. Md. 2003); *Jackson v. State of Maryland*, 171 F. Supp. 2d 532 (D. Md. 2001). To be sure, even after *Burlington Northern*, a number of courts have concluded that a negative performance evaluation was insufficient to defeat a defendant's summary judgment motion. *Parsons v. Wynne*, 221 F. App'x 197, 198 (4th Cir. 2007) (per curiam); *Simmington, supra*, 2010 WL 1346462, at *13; *Toulan v. DAP Products, Inc.*, 2007 WL 172522, at *9 (D. Md. Jan. 17, 2007). Here, however, plaintiff also alleges a failure to promote, and thus in any event dismissal based on a failure to show an adverse employment action is unwarranted.

considered. Def. Mem. at 20. Although plaintiff does not explicitly address that argument in her Opposition, the Fourth Circuit has made clear that a plaintiff need not exhaust administrative remedies for retaliation related to an EEOC complaint and, instead, may raise a retaliation claim for the first time in federal court. *Jones*, 551 F.3d at 302; *see Murphy-Taylor*, *supra*, 2013 WL 4924031, at *13 ("[T]he retaliation claims brought by plaintiffs and the United States are not subject to dismissal for failure to exhaust administrative remedies."). Moreover, although plaintiff's Charge of Discrimination did not reference failure to promote, it did identify retaliation as a basis for her allegations. *See* ECF 14-2. In my view, plaintiff's allegations are sufficient to survive dismissal. Likewise, plaintiff has pleaded a sufficient causal connection between her protected conduct and the alleged retaliatory action. Because dismissal on this basis would be premature, Count III may proceed.

### 4. Count IV: FMLA retaliation claim (against the individual defendants)

Count IV purports to set forth a claim against Sturgill and Ahern-Brown for retaliation under the FMLA. *See* Am. Compl. ¶¶ 64-69 (Count IV). Defendants maintain that Count IV should be dismissed because Wright was not on FMLA leave during the relevant time; an employee's individual supervisors at a public agency cannot be held liable for an FMLA violation, and in any event are entitled to qualified immunity; and plaintiff failed to allege a cognizable adverse employment action or that she suffered any harm or injury due to the purportedly retaliatory conduct. Def. Mem. at 6-7, 23-29.

Under the FMLA, certain employees may take a total of "12 work weeks of leave" during a twelve-month period due to a "serious health condition" that makes the employee "unable to perform the functions of" her job. 29 U.S.C. § 2612(a)(1)(D). In addition, the FMLA "contains

*proscriptive* provisions that protect employees from discrimination or retaliation for exercising their substantive rights under the FMLA." *Yashenko*, 446 F.3d at 546 (emphasis in original). To that end, the FMLA makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter." 29 U.S.C. § 2615(a)(1). "While the FMLA does not specifically forbid discharging an employee in retaliation for his use of FMLA leave, 29 C.F.R. § 825.220(c) states that employers are 'prohibited from discriminating against employees or prospective employees who have used FMLA leave' and that 'employers cannot use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions, or disciplinary actions.'" *Dotson v. Pfizer, Inc.*, 558 F.3d 284, 294-95 (4th Cir. 2009). *See also, e.g.*, *Greene v. YRC, Inc.*, --- F. Supp. 2d ----, 2013 WL 6537742, at *8 (D. Md. Dec. 12, 2013) (Garbis, J.). Thus, courts have interpreted the FMLA to provide a cause of action for retaliation. *Dotson*, 558 F.3d at 295.

The familiar *McDonnell Douglas* burden-shifting framework applies to plaintiff's FMLA retaliation claim. *See*, *e.g.*, *Yashenko*, 446 F.3d at 550-51; *Nichols v. Ashland Hosp. Corp.*, 251 F.3d 496, 502 (4th Cir. 2001). Under that framework, plaintiff bears the burden at trial of making a prima facie showing "'that [s]he engaged in protected activity, that the employer took adverse action against [her], and that the adverse action was causally connected to the plaintiff's protected activity.'" *Yashenko*, 446 F.3d at 551 (quoting *Cline v. Wal-Mart Stores, Inc.*, 144 F.3d 294, 301 (4th Cir. 1998)). If plaintiff "'puts forth sufficient evidence to establish a prima facie case of retaliation'" and the employer "'offers a non-discriminatory explanation'" for the adverse action, plaintiff "'bears the burden of establishing that the employer's proffered explanation is pretext for FMLA retaliation.'" *Id.* (quoting *Nichols*, 251 F.3d at 502).

Among other disputes, the parties disagree as to the nature of plaintiff's two relevant leaves of absence.  As noted, Wright took an initial medical leave of absence from approximately December 5, 2008, until February 17, 2009.  Am. Compl. ¶ 12.  Defendants maintain that Wright was on FMLA leave between December 2008 and February 2009.  Def. Mem. at 24.  Plaintiff insists, however, that she was on workers' compensation leave between December 2008 and February 2009, and only took FMLA leave beginning in November 2009.  Am. Compl. ¶¶ 35-38; Opp. at 16-17.  For their part, defendants maintain that Wright had exhausted her FMLA leave time as of November 2009, and therefore was ineligible for FMLA leave at that time.  Def. Mem. at 24.

Although the Court cannot decide this issue in the context of a Rule 12(b)(6) motion, it is unnecessary to do so here in order to resolve the FMLA claim.  Even assuming plaintiff was on FMLA leave in late 2009, she fails adequately to allege any adverse employment action or cognizable harm that resulted from the alleged retaliatory conduct.  As noted, an adverse employment action is one that "adversely affect[s] the terms, conditions, or benefits of the plaintiff's employment."  *Holland v. Washington Homes, Inc.*, *supra*, 487 F.3d at 219.  In *Bosse v. Baltimore Co.*, 692 F. Supp. 2d 574, 588 (D. Md. 2010), the court applied the adverse employment action standard found in *Burlington Northern* to an FMLA retaliation claim.  Under that test, to show an adverse employment action, an employee "must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Burlington Northern*, 548 U.S. at 68; *accord Bosse*, 692 F. Supp. 2d at 558.  As

noted, antiretaliation provisions are intended to "protect[] an individual not from all retaliation, but from retaliation that produces an injury or harm." *See Burlington Northern*, 548 U.S. at 67.

Here, much of the conduct plaintiff alleges in connection with her FMLA retaliation claim was completed or, at minimum, began well *before* the start of the alleged FMLA leave in November 2009. *See* Am. Compl. ¶ 66 (citing, *inter alia*, "making unwarranted negative ratings and unflattering comments in Wright's personnel file"; "pressuring Wright to accept an unwanted internal transfer"; and "encouraging other DSS employees to demean, humiliate, and otherwise ostracize Wright"). For instance, the only allegations concerning pressure on Wright to accept an internal transfer indicate that the purported conduct occurred during March and April 2009, half a year before the November-December 2009 leave of absence. *See* Am. Compl. ¶¶ 25-27. Similarly, plaintiff alleges that defendants included negative information in her personnel file, *see* Am. Compl. ¶ 66, but the only negative review that plaintiff identifies was given in July 2009, months before the alleged FMLA leave. *See id.* ¶ 32. By contrast, the only action contemporaneous with Wright's purported FMLA leave was the alleged "harassing [of] Wright about work-related matters[.]" Such conduct falls well short of meeting even the relaxed standard of *Burlington Northern*. *See* 548 U.S. at 68; *see also Anusie-Howard v. Todd*, 920 F. Supp. 2d 623, 625, 630 (D. Md. 2013) (no FMLA retaliation violation where supervisor "'initiated aggressive arguments with [plaintiff] regarding her use of her FMLA benefits'" because actions failed to meet *Burlington Northern* standard for material adversity by imposing disciplinary action or having a tangible employment consequence) (quoting complaint).[17]

_____

[17] At most, the court indicated in *Anusie-Howard* that the allegations could support an FMLA interference claim rather than a retaliation claim. *See id.* at 630. "To establish unlawful

In her Opposition, plaintiff directly asserts, for the first time, a failure-to-promote allegation in connection with her FMLA retaliation claim. *See* Opp. at 21. Notably, the Amended Complaint contains express failure-to-promote allegations in connection with Count I (the Title VII discrimination claim) and Count III (the Title VII retaliation claim), but Count IV's FMLA retaliation claim makes no mention of failure to promote. To be sure, in Count IV, ¶ 64, plaintiff incorporates by reference her earlier allegations. However, the Amended Complaint's failure-to-promote allegations assert only race-based discrimination. Am. Compl. ¶¶ 40-41 (alleging preference for Caucasian over African-American candidates); *see Mylan Laboratories, Inc. v. Akzo, N.V.*, 770 F. Supp. 1053, 1068 (D. Md. 1991) ("'[I]t is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss.'") (quoting *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101 (7th Cir. 1984)), *aff'd*, 2 F.3d 56 (4th Cir. 1993); *see also Zachair Ltd. v. Driggs*, 965 F. Supp. 741, 748 n. 4 (D. Md. 1997) (stating that a plaintiff "is bound by the allegations contained in its complaint and cannot, through the use of motion briefs, amend the complaint"), *aff'd*, 141 F.3d 1162 (4th Cir. 1998).

Moreover, although plaintiff maintains that the failure to promote occurred "shortly after" the medical leave, Opp. at 21, in actuality she did not interview for another position for more than two years after her return in December 2009 from the alleged FMLA leave. This is not a case in which the "intervening period" between the purported FMLA leave and the failure to promote contains "other evidence of retaliatory animus." *See Lettieri*, *supra*, 478 F.3d at 650.

interference with an entitlement to FMLA benefits, an employee must prove that: (1) she was an eligible employee; (2) her employer was covered by the statute; (3) she was entitled to leave under the FMLA; (4) she gave her employer adequate notice of her intention to take leave; and (5) the employer denied her FMLA benefits to which she was entitled." *Rodriguez v. Smithfield Packing Co.*, 545 F. Supp. 2d 508, 516 (D. Md. 2008). In this case, plaintiff raises no such claim, nor would the facts alleged support one.

To the contrary, the Amended Complaint is devoid of allegations dating from 2010 or 2011, let alone allegations of retaliation for taking FMLA leave. And, as noted, the Amended Complaint's factual allegations concerning the 2012 promotion process raise claims of racial discrimination, without any reference to discrimination on the basis of a prior FMLA leave. *See* Am. Compl. ¶¶ 40-41. Because the Amended Complaint's failure-to-promote allegations are wholly divorced from the allegations of retaliation under the FMLA, and because plaintiff does not plausibly allege any causal connection between any FMLA leave taken in 2009 and a failure to promote her in 2012, I will dismiss Count IV, without addressing defendants' other arguments.

### 5. Count V: 42 U.S.C. § 1983 (against the individual defendants)

Count V alleges a claim under 42 U.S.C. § 1983 against Sturgill and Ahern-Brown. *See* Am. Compl. ¶¶ 70-74 (Count IV). Specifically, Count V asserts deprivations of various federal rights, including rights under the Equal Protection Clause of the Fourteenth Amendment, Title VII, the FMLA, and 42 U.S.C. § 1985(3). *Id.* ¶ 71. Defendants contend that dismissal of Count V is warranted because 42 U.S.C. § 1983 does not provide an independent cause of action and, in any event, is duplicative of other counts in the Amended Complaint. Def. Mem. at 7, 29-31.

Section 1983 establishes a cause of action against any "person" who, acting under color of state law, "subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. However, § 1983 "'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere

conferred.'" *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)).

Plaintiff argues that Count V is not wholly duplicative of other counts, given that "nowhere else in the Amended Complaint does Wright allege a violation of the Equal Protection Clause of the Fourteenth Amendment." Opp. at 21. But, in her Opposition, plaintiff does not address defendants' arguments concerning Title VII, the FMLA, or 42 U.S.C. § 1985(3). Apparently, Wright concedes that Count V is duplicative of those other counts. *See, e.g.*, *Ferdinand-Davenport v. Children's Guild*, 742 F. Supp. 2d 772, 777 (D. Md. 2010) ("By her failure to respond to [defendant's] argument" in a motion to dismiss, "the plaintiff abandons [her] claim."); *Mentch v. E. Sav. Bank, FSB*, 949 F. Supp. 1236, 1247 (D. Md. 1997) (plaintiff's failure to address in opposition brief an argument raised in defendant's opening brief constitutes abandonment of claim).

Additionally, plaintiff observes that § 1983 provides the exclusive federal remedy for a claim based upon 42 U.S.C. § 1981, while acknowledging that § 1981 is not expressly cited in connection with Count V. *See id.* at 22 & n.4. *See also, e.g.*, *Lewis V. Robeson County*, 63 F. App'x 134, 138 (4th Cir. 2003) ("In a suit brought against a state actor, [§] 1983 is the exclusive federal remedy for a violation of the rights guaranteed in § 1981."); *Farmer v. Ramsay,* 43 F. App'x 547, 553 (4th Cir. 2002) (because "§ 1983 is the exclusive remedy for violations of § 1981 by state actors," plaintiff had "no cause of action based on § 1981 independent of § 1983"). In my view, even if Count V of the Amended Complaint can be read to include a claim under § 1981, Count II already states a § 1981 claim, rendering that aspect of Count V duplicative.

Plaintiff is correct, however, that Count V is not wholly duplicative of other counts, given that it contains an Equal Protection claim under the Fourteenth Amendment, which is not alleged elsewhere in her suit. The Equal Protection Clause of the Fourteenth Amendment affords "protection to employees who serve the government as well as to those who are served by them, and § 1983 provides a cause of action for all citizens injured by an abridgment of those protections." *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 119-20 (1992). Although defendants suggest in a footnote that Count II's claim under 42 U.S.C. § 1981 is duplicative of the Fourteenth Amendment aspect of Count V, they provide no authority or further explanation as to why that is so. *See* Def. Mem. at 30 n.8. Accordingly, to that extent, Count V withstands dismissal.

### 6. Count VI: 42 U.S.C. § 1983 (against DSS)

Count VI contains a claim under 42 U.S.C. § 1983 against DSS, premised on violations of plaintiff's rights under the Equal Protection Clause of the Fourteenth Amendment, Title VII, the FMLA, and 42 U.S.C. § 1985(3). *See* Am. Compl. ¶¶ 75-79 (Count VI). According to defendants, because DSS is not a "person" under 42 U.S.C. § 1983, Count VI is subject to dismissal. Def. Mem. at 7. Plaintiff concedes as much, *see* Opp. at 21 n.3, and thus Count VI will be dismissed.

### 7. Count VII: 42 U.S.C. § 1985(3) (against the individual defendants)

In Count VII, plaintiff alleges that Sturgill and Ahern-Brown conspired to deprive her "of the equal enjoyment of rights secured by the law on the basis of Wright's race, color, gender, and/or disability," in violation of 42 U.S.C. § 1985(3). Defendants contend that plaintiff has failed to sufficiently plead a conspiracy pursuant to 42 U.S.C. § 1985(3).

The Fourth Circuit has explained that, in order to state a claim for a civil conspiracy under § 1985(3), a plaintiff must show:

> "(1) a conspiracy of two or more persons, (2) who are motivated by a specific class-based, invidiously discriminatory animus to (3) deprive the plaintiff of the equal enjoyment of rights secured by the law to all, (4) and which results in injury to the plaintiff as (5) a consequence of an overt act committed by the defendants in connection with the conspiracy."

*A Society Without A Name*, *supra*, 655 F.3d at 346 (quoting *Simmons v. Poe,* 47 F.3d 1370, 1376 (4th Cir. 1995)). Further, a plaintiff "'must show an agreement or a meeting of the minds by [the] defendants to violate the [plaintiff's] constitutional rights.'" *Id.* at 346 (quoting *Simmons*, 47 F.3d at 1377; modifications and quotation marks omitted in *A Society Without A Name*).

Courts "'have specifically rejected section 1985 claims whenever the purported conspiracy is alleged in a merely conclusory manner, in the absence of concrete supporting facts.'" *A Society Without A Name*, 655 F.3d at 346 (quoting *Simmons*, 47 F.3d at 1377). *See also Simmons*, 47 F.3d at 1377 ("[The Fourth Circuit] has rarely, if ever, found that a plaintiff has set forth sufficient facts to establish a section 1985 conspiracy, such that the claim can withstand a summary judgment motion."); *Rich v. Montgomery County, Md.*, 98 F. App'x 933, 938 (4th Cir. 2004) (affirming dismissal of § 1985 conspiracy claim and citing district court's observation that plaintiff did not allege "'facts that tend to show that a joint plan or agreement existed to deprive [plaintiff] of her constitutional rights'").

As an initial matter, defendants argue that Count VII should be dismissed because the conduct underlying the § 1985 violations—a deprivation of plaintiff's legal rights based on her "race, color, gender, and/or disability"—are no different than the allegations underlying the Title VII claims. *See* Def. Mem. at 35. As defendants note, *id.*, the Supreme Court has held that the

"deprivation of a right created by Title VII cannot be the basis for a cause of action under § 1985(3)." *Great Am. Federal Sav. & Loan Ass'n v. Novotny*, 442 U.S. 366, 378 (1979). Accordingly, to the extent Count VII is based upon a conspiracy to violate rights secured by Title VII, plaintiff's claims are foreclosed. *See id.*

That dispute is immaterial, however, because Count VII suffers from a more fundamental flaw. In particular, plaintiff has plainly failed to plead any "agreement or meeting of the minds" between Sturgill and Ahern-Brown. *See* Am. Compl. ¶¶ 80-83. As in *A Society Without A Name*, plaintiff has alleged nothing more than "'parallel conduct and a bare assertion of a conspiracy.'" 655 F.3d at 347 (quoting *Twombly, supra*, 550 U.S. at 556). Such allegations are insufficient to survive a motion to dismiss. *See* 655 F.3d at 347.[18]

## C. Leave to Amend

The only remaining question is whether plaintiff should be granted leave to amend, which she requests in her Opposition. *See* Opp. at 25 (seeking, as an alternative, "leave to amend her Amended Complaint to correct whatever deficiencies the Court determines exist therein"). *See also* Fed. R. Civ. P. 15(a)(2). Denial of leave to amend is appropriate where "'the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would be futile.'" *Edwards v. City of Goldsboro*, 178 F.3d 231, 242

---

[18] The facts of *James v. Village of Willowbrook*, 2012 WL 3017889 (N.D. Ill. July 19, 2012), on which plaintiff relies, *see* Opp. at 25, are far afield from those presented here. That case involved, *inter alia*, allegations by two African-American plaintiffs that various neighbors, the police, and their municipality conspired to deprive the family of its right to equal police protection. *See* 2012 WL 3017889, at *6. The district court noted that, among other things, plaintiffs' complaint "includes an explicit allegation of collusion when it states that, since 2002, the Officers and Neighbors . . . met at [one resident's] home in the evening to discuss how to 'deal with the unwanted James family being in the neighborhood.'" *Id.* at *10.

(4th Cir. 1999) (quoting *Johnson v. Oroweat Foods Co.*, 785 F.2d 503, 509 (4th Cir. 1986));
*accord Balas*, *supra*, 711 F.3d at 409; *Green v. Wells Fargo Bank, N.A.*, 927 F. Supp. 2d 244,
257 (D. Md. 2013).

As previously noted, plaintiff already has had one opportunity to amend; she filed the
Amended Complaint shortly after DSS filed its first motion to dismiss. *See* ECF 5 (motion to
dismiss) and ECF 8 (Amended Complaint). Therefore, plaintiff had the chance to cure various
pleading defects, including ones that DSS had identified. Moreover, no grounds exist for
believing that further amendment would cure the defects that remain as to several counts of the
Amended Complaint. Significantly, plaintiff attached to the Opposition her Affidavit, in which
she supplied additional facts known to her regarding her claims. However, as explained above,
the Affidavit does not materially add to the factual allegations already found in the Amended
Complaint. Under these circumstances, a further opportunity to amend is unwarranted.

### Conclusion

For the foregoing reasons, defendants' Motion is granted in part and denied in part. A
separate Order, consistent with this Memorandum Opinion, follows.


Date:   January 24, 2014                              _____/s/_____
                                                     Ellen Lipton Hollander
                                                     United States District Judge